United States District Court
Southern District of Texas
FILED

JAN 1 0 2000

Michael N. Milby, Clerk

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF TEXAS

# AT CORPUS CHRISTI

#1

---

## NO. C-96-CR-84

C.a. C-00-10

### JESUS JOSE ESCOBAR,
Petitioner,

vs.

### UNITED STATES OF AMERICA,
Respondent.

---

FILED UNDER SEAL

---

TO THE HONORABLE HAYDEN W. HEAD, JR.
UNITED STATES DISTRICT JUDGE

---

## MOTION TO VACATE SENTENCE
## PURSUANT TO 28 U.S.C. § 2255

---

SCOTT M. ELLISON, P.L.L.C.
SBN: 00787432
1116 Santa Fe Street
Corpus Christi, TX 78404
Telephone: (361) 887-7600
Telecopier: (361) 882-4728

617

# MODEL FORM FOR MOTIONS UNDER
## 28 U.S.C. § 2255

**Name:** Jesus Jose Escobar

**Prisoner Number:** 68900-079.

**Place of Confinement:** P.O. Box 4200, Three Rivers, TX 78071.

**United States District Court** Southern District Of Texas, At Corpus Christi.

**Case No. C-96-CR-84**

**United States    v.    Jesus Jose Escobar**

**MOTION TO VACATE, SET ASIDE, OR CORRECT
SENTENCE BY A PERSON IN
FEDERAL CUSTODY**

**<u>MOTION</u>**

1. **Name and location of court which entered the judgment of conviction under attack:**
   United States District Court, Southern District Of Texas, At Corpus Christi.

2. **Date of judgment of conviction**: 12-20-96.

3. **Length of sentence:** 292 months incarceration.

4. **Nature of offense involved**: 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute More Than 1,000 Kilograms of Marijuana) (Count One) and 21 U.S.C. § 841(a)(1) (Aiding & Abetting to Possession with Intent to Distribute Approximately 99 Pounds Of Marijuana) (Count 2) and 21 U.S.C. § 841(a)(1) (Aiding & Abetting to Possession with Intent to Distribute Approximately 415 Pounds Of Marijuana) (Count Three) and 21 U.S.C. § 841(a)(1) (Aiding & Abetting to Possession with Intent to Distribute Approximately 1500 Pounds Of Marijuana) (Count Six) and 21 U.S.C. § 841(a)(1) (Aiding & Abetting to Possession with Intent to Distribute Approximately 2060 Pounds Of Marijuana) (Count Seven).

5. **What was your plea?**
   **(a) Not Guilty**.....................[x]
   **(b) Guilty**............................[]
   **(c) Nolo contendere**.............[]

CSHPDF - www.foxiso.com

6.     **Kind of trial:**
       **(a) Jury**...............................[x]
       **(b) Judge only**....................[]

7.     **Did you testify at the trial?**
       **Yes [x] No []**

8.     **Did you appeal from the judgment of conviction?**
       **Yes [x] No []**

9.     **If you did appeal, answer the following:**
       **(a) Name of court:** USCA 5.
       **(b) Result:** Conviction affirmed.
       **(c) Date of result:** 12-4-97.

10.    **Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any federal court?**
       **Yes [x] No[]**

11.    **If your answer to 10 was "yes," give the following information:**
       **(a)**      **(1) Name of Court:** .U.S.D.C. Southern District of Texas.
                    **(2) Nature of proceeding:** Motion for New Trial.
                    **(3) Grounds raised:** Improper shifting of burden in jury instructions.
                    **(4) Did you receive an evidentiary hearing on your petition, application or motion? Yes [] No [x]**
                    **(5) Result:** Motion denied.
                    **(6) Date of result:** 10-31-96.

       **(b)**      **(1) Name of Court:** U.S.C.A. 5.
                    **(2) Nature of proceeding:** Motion for Rehearing.
                    **(3) Grounds raised:** Improper shifting of burden in jury instructions.
                    **(4) Did you receive an evidentiary hearing on your petition, application or motion? Yes [] No [x]**
                    **(5) Result:** Motion denied.
                    **(6) Date of result:** 1-8-98.

       **(c) As to any second petition, application or motion give the same information:**
                    **(1) Name of court:** Supreme Court of the United States.
                    **(2) Nature of proceeding:** Petition for Writ of Certiorari.
                    **(3) Grounds raised:** Supreme Court Rule 10 issues.
                    **(4) Did you receive an evidentiary hearing on your petition, application or motion? Yes [] No [x]**

3

(5) **Result**: <u>Petition denied.</u>
(6) **Date of result**: <u>10-5-98.</u>

(d) **As to any third petition, application or motion, give the same information:**
    (1) **Name of court**: <u>Supreme Court of the United States.</u>
    (2) **Nature of proceeding**: <u>Petition for Rehearing.</u>
    (3) **Grounds raised**: <u>Supreme Court Rule 10 issues.</u>
    (4) **Did you receive an evidentiary hearing on your petition, application or motion? Yes [] No[x]**
    (5) **Result**: <u>Denied.</u>
    (6) **Date of result**: <u>1-11-99.</u>

(e) **Did you appeal, to an appellate federal court having jurisdiction, the result of action taken on any petition, application or motion?**
    (1) **First petition, etc**...............Yes [x] No[]
    (2) **Second petition, etc**...........Yes [x] No []
    (3) **Third petition, etc**.............Yes [x] No[]
    (4) **Fourth petition, etc**............Yes [] No [x]

(f) **If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not**: <u>There is nowhere to appeal denial of certiorari by the Supreme Court.</u>

12.   State concisely every ground on which you claim that you are being held unlawfully. Summarize briefly the facts supporting each ground. If necessary, you may attach pages stating additional grounds and facts supporting same.

   **A. Ground one:** <u>Ineffective assistance of counsel in pretrial proceedings at trial, at sentencing, and on direct appeal.</u>

   **Supporting FACTS:** <u>The facts supporting this ground are set forth in the "Statement of Claim" on the attachments to this page and are addressed in the accompanying Memorandum of Law. Mr. Escobar incorporates those facts by reference  as if set forth in full herein.</u>

   **B. Ground Two:** <u>Conflict of interest in pretrial, trial, and sentencing proceedings.</u>

   **Supporting FACTS:** <u>The facts supporting this ground are set forth in the "Statement of Claim" on the attachments to this page and are addressed in the accompanying Memorandum of Law. Mr. Escobar incorporates those facts by reference  as if set forth in full herein.</u>

4

# STATEMENT OF CLAIM

5

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

THE UNITED STATES OF AMERICA     *

                                      *

VS.                                *          CRIMINAL NO. C-96-84

                                        *

JESUS ESCOBAR                   *

## AFFIDAVIT OF ALBERT A. PENA, III

I, Albert A. Pena, III, being first duly sworn according to !aw, depose and say as follows:

1.       I am an attorney practicing criminal law in the Southern District of Texas.

2.       During and between 3-12-96 thru 12-20-96, including critical stages of the criminal proceedings and the pretrial process of Mr. Escobar's case, I represented Mr. Escobar. At the same time, I simultaneously represented the interests of Manuel Guerra, a co-defendant in this indictment.

3.       During and between 3-12-96 thru 12-20-96, including critical stages of the criminal proceedings and the pretrial, trial, and sentencing process of Mr. Escobar's case, I represented Mr. Escobar. At the same time, I simultaneously represented my own personal interest to not be charged for possessIng or dealing cocaine as alleged by prosecution witness Benito Silva. More specifically, while ostensibly representing Mr. Escobar, I had a duty of loyalty to my own personal interest to not be charged for possessing cocaine as alleged by prosecution wltness Benito Silva.

4.       During and between 3-12-96 thru 12-20-96, including critical stages of the criminal proceedings and the pretrial, trial, and sentencing process of Mr. Escobar's case, the interests of Manuel Guerra, my own personal interest to not be charged for possessing or dealing cocaine, and the interests of Mr. Escobar were inconsistent, in conflict and did diverge with respect to material factual and legal issues as well as to favorable and/or appropriate courses of action. More specifically, at arraignment, I. could not advise Mr. Escobar to plead guilty and accept responsibility because his dIsclosures would have potentially adversely affected Manuel Guerra. At the same time, I could not advise Manuel Guerra to plead guilty and accept responsibility because his disclosures would have potentially adversely affected Mr. Escobar.

5.       Additionally, at trial, I could have and should have conducted a more aggressive defense of Mr. Escobar by directly attacking the credibility of Benito Silva through cross examination which explored Silva's statements that he'd sold cocaine to me. This cross examination would have demonstrated to the jury what a liar that Silva was and how unbelievable his other testimony therefore was also. At the same time that I should have been attacking the credibility of Silva through cross examination about his statements that he'd sold cocaine to me, I was prevented from such an attack because either too aggressive of an attack, or an unsuccessful attack, would potentially have caused the prosecutor to bring charges against me for the cocaine transactions I was allegedly involved in.

CtsPDF - www.texis.com

It was a catch 22 for me as a result of my divided loyalty.

6.    I will testify to the foregoing under oath.

7.    I have read the foregoing and state that the facts are based on my personal knowledge and are true and correct.

**WITNESS MY HAND** this _7H_ day of _October_, 1999.


Albert A. Pena, III
4444 Corona, Suite 150
Corpus Christi, TX 78411

**THE STATE OF TEXAS**         §
**COUNTY OF NUECES**          §

**BEFORE ME**, the undersigned authority, on this day personally appeared Albert A. Pena, III, known to me to be the person whose name is subscribed to the foregoing instrument, and after being duly sworn by me, did state upon his oath that the facts contained in said instrument are true and correct.

**SUBSCRIBED AND SWORN TO** before me, on this _7th_ day of ~~September~~ October, 1999, to certify which witness my hand and seal of office.

LEOPOLDO SANCHEZ, JR.
MY COMMISSION EXPIRES
July 17, 2003

Notary Public in and for the State of Texas

7.

Case 2:00-cv-00010   Document 1   Filed in TXSD on 01/10/2000   Page 8 of 51

JUDGE PRESIDING:    HAYDEN W. HEAD, JR.

COURTROOM CLERK:    Judith F. Alvarez

COURT RECORDER:    Lori Lopez

LAW CLERK: _____

U.S.P.O.:    Glenn Reinike   USPT: Alma Irr

U.S. MARSHAL:    James Torrez

INTERPRETER: _____

B States District Court
Southern District of Texas
FILED

SEP 2 3 1996

Michael N. Milby
Clerk of Court

DATE: September 23, 1996    OPEN: 8:35 am   ADJOURN: 8:36 am

                                        9:12 am   —   9:58 am

TAPE: 1                10:54 am   —   11:36 am.

CRIM ACTION NO.:    CR-C-96-84 (4)    3:15 pm   —   3:49 pm

UNITED STATES OF AMERICA    )   COUNSEL: Charles Dause

                                  )                    Eric Reed

VS.

PABLO GONZALEZ           )   COUNSEL:   Bill May

                              )

====================================================

Case called for FINAL PRETRIAL CONFERENCE. Gonzalez; role was responsible for storage of marij from 92-94. Deft Mtn for Disclosure of Impeachment Evidence; granted. No other motions. Def Atty states that he will work out stipulations on seizure evidence. Def Atty states that he will question co-deft Silva about lack of cocaine charges without going into Peña's issue. Gov will not bring up issue. + will not be charging Pena for on issue. Def atty will instruct witnesses not to bring up Peña's name. Def Atty states that tape of Carranza bringing up issue of giving money to Pena for laundering was given to him late + did not know about it.

8

Case 2:00-cv-00010   Document 1   Filed in TXSD on 01/10/2000   Page 9 of 51

Def Atty May states no agreements on phone records. Court asks parties to return at 1:15 pm. After a brief recess, court will take up the issue of murder evidence.

Case recalled at at 10:54 am. The Court explains the substance of the in camera hearing with Escobar + Def Atty.

Discussion of murder evidence in Florida. Def Atty thinks that evidence will give Deft Benny Silva a motive to testify so that he will not be charged for the murder in Florida. Court grants Deft's motion in limine. Arguments heard. Court wants out of court hearing with Silva + witnesses during trial sometime at end of day.

Discussion of 2nd murder by Jose Luis Garcia who will testify in trial. There is no plea agreement with respect to Garcia. Court states that Garcia should be put on stand outside presence of jury.

9

Case 2:00-cv-00010    Document 1    Filed in TXSD on 01/10/2000    Page 10 of 51

PAGE: __3__    CR/CR NO.: __C96-8414__

__USA__ VS. __Gonzales__

PROCEEDING: __FPTC__

DATE: SEP 2 3 1996

The Gov states that the paperwork on Garcia issue cannot be vouched by Gov.

Def Atty May has objection to exhibit of Border Patrol Crossing by entry report of crossing of Pablo Gonzalez & Benny Silva. Court takes notes of exhibit + will rule during trial. The Court will take up issues of stipulations + exhibits at 3:00 pm today.

Case recalled at 3:15 pm. The Court has appointed Grant Jones for Escobar on issues of Pina as def atty. Gov stipulates in writing on drug evidence + title histories; no obj from all parties. The Court admonishes all 3 defts on stipulations. Stipulations admitted. Def Atty for Gonzalez objects to GX #10 +54.

Def Atty amends his witness list to include Gilbert Gonzalez & Juan Hernandez, no obj from Gov; granted. Parties excused until 9:00 am 9-24-96 for jury selection.

CutePDF - www.fastio.com

Case 2:00-cv-00010   Document 1   Filed in TXSD on 01/10/2000   Page 11 of 51

JUDGE PRESIDING: _____ HUEN W. HEAD, JR. _____

COURTROOM CLERK: _____ Judith F. Alvarez _____

COURT RECORDER: _____ Lori Lopez _____

LAW CLERK: _____

U. S. P. O.: _Glenn Reinicke_ / USPT: _Alma Irr_

U.S. MARSHAL: _James Torrez_

INTERPRETER: _____

DATE: September 23, 1996   OPEN: 8:35 am   ADJOURN: 8:36 am

TAPE: _1_                  9:16 am  —  9:58 am.
                          10:45 am  —  11:36 am
CRIM ACTION NO.: _CR-C-96-84 (1)_   3:15 pm  —  3:49 pm

UNITED STATES OF AMERICA          )   COUNSEL: Charles Dause
_____             )            Eric Reed

VS.

JESUS JOSE ESCOBAR                )   COUNSEL: Albert Pena
_____             )

===============================================================

Case called for FINAL PRETRIAL CONFERENCE. Discussion of issue of Def Atty Pena being a potential deft because co-defts sold him drugs. Gov does not intend to use it during trial. Def Atty asks court to ask Escobar "in camera" ~~+ ask him~~ if he is willing to continue with Pena in jury trial. The Court asks Deft Escobar in open court if he wants to continue with Pena; deft answers yes. Deft does not want to talk to any other lawyers. Deft states that he will not bring up later the issue of a 2255 claim because gov would prose-cute if deft atty did not put up good def.

11

PAGE: 2  CW CR  C 96-84 (1)

USA  VS. Escobar

PROCEEDING: 7PT C

DATE: SEP 2 3 1996

Gov states that he will not bring up the issue of Pena's cocaine purchase. They will not bring charges against Pena. Gov will instruct witnesses that they are not to bring up name of Pena. Deft Escobar states he was not aware of issue of money laundering. The Court offers atty so that Deft can discuss issue of having Pena as lawyer; he refuses. Def atty Pena states he thinks that it would be reasonable to do. Gov has no obj to Pena as atty. Gov will not move to disqualify Pena as atty because he feels that it is Escobar's decision. That issue will not be brought up by Gov during trial. Court orders all parties about matters discussed about allegations of Silva about Pena shall not be discussed during trial; no obj by parties. Def atty Pena asks to meet with Court in camera about other issues. Gov oral motion suppress regarding evidence on any murders deft involved in + bring up to court before bringing it up.

12

Case 2:00-cv-00010   Document 1   Filed in TXSD on 01/10/2000   Page 13 of 51

PAGE: 3    CA/CR ).: C96-84

USA    VS. Escobar

PROCEEDING: 7PTC

DATE: SEP 2 3 1996

Brief recess. — when recall Court will tal about issue of murders. The Court will consider the in camera issue after recess

Case recalled at 10:45 am. The Court will hear "in camera" discussion in open courtroom. All spectators + parties are excused except for Pena & Escobar. Pena states that Deft is being harassed by Gov Escobar it was on probation for previous conviction. Def Atty Pena states that gov agent stated that Pena bribed the Court (Judge) in previous case in order to get probation. to Pena states that former co-deft Salvador Rodriquez gave that info to gov. agent Rene A

Discussion of murder evidence in Florida. The Court will take up issues of exhibits + stipulations at 3:00 today

Case recalled at 3:15 pm. Court appoints Grant Jones to speak w/ Escobar to find out if there are reasons that Pena not be his lawyer.

13

Case 2:00-cv-00010   Document 1   Filed in TXSD on 01/10/2000   Page 14 of 51

Escobar answers that he does not want Jones
as an attorney on that issue. Jones is
excused from court room.

  Gov stipulation in writing on marijuana
evidence ~~amount~~ + title histories of vehicles;
no obj from all parties. The Court admonishes
all 3 defts on stipulations. All stipulations
admitted. Gov states that marijuana
samples will not be ~~admitted~~ introduced: Gx # 30,
40, & 49. Obj by Def Atty f/Escobar to
Gx #55. Gov requests having 2 case agents
at table with him; no obj from parties;
granted. Case agents are Steve White +
David Gonzales. The Court does not want
redacted indictment. Gov will be dismiss-
ing count 10 on Escobar; court ~~to~~ grants
dismissal motion. Def Atty asks court to
allow Catherine Dunzer to sit at his def
table; no obj from gov; granted. Parties
excused until 9:00 am  9-24-96 for jury
selection.

REQUESTED BY:  WHITE, STEVE H
               O F F I C I A L   U S E   O N L Y

---

| DEPARTMENT OF THE TREASURY | 1. TECS ACCESS CODE 3 |
| UNITED STATES CUSTOMS SERVICE | |

R E P O R T   O F   I N V E S T I G A T I O N

2. PAGE   1

3. CASE NUMBER CC13MR95CC0019
       OCDETF NO:  SW-TXS-201

4. TITLE: BENITO SILVA JR.

---

5. CASE STATUS:    INTERIM RPT

---

| 6. REPORT DATE | 7. DATE ASSIGNED | 8. CLASS | 9. PROGRAM CODE | 10. REPORT NO. |
|---|---|---|---|---|
| 012599 | 032295 | 1 | 210 | 031 |

---

11. RELATED CASE NUMBERS:    CC13MR94CC0011  C13CS90CC0045  CB13MR92CB0014
       CC02CR92CC0004  FD02HE91FD0003

12. COLLATERAL REQ:

---

13. TYPE OF REPORT:
    INVESTIGATIVE FINDINGS /  MEMO OF INTERVIEW

---

TOPIC: ALONZO SANCHEZ

---

14. SYNOPSIS:
On April 12, 1995, RAIC/Corpus Christi, Texas initiated an OCDETF
investigation into the drug smuggling activities of Benito SILVA Jr. and the
Jesus ESCOBAR/Benito SILVA Jr. drug smuggling organization. This organization
was smuggling marihuana, cocaine, and heroin for at least ten years. To date,
eighteen subjects have been indicted for their participation in the drug
smuggling organization, fourteen of which have been convicted. Included in
those convicted are the leaders of the organization, ESCOBAR, and SILVA. Two
subjects remain fugitives, while one subject had charges dismissed in the
interest of the government.

Benito SILVA Jr. has been cooperating with the investigating agents and has
been interviewed on several occasions. During previous debriefings, SILVA told
agents about his uncle, Alonzo SANCHEZ's involvement in the drug smuggling
conspiracy. This R.O.I. documents SILVA's information regarding SANCHEZ.

---

| 15. DISTRIBUTION: | 16. SIGNATURE: |
|---|---|
| RACCC SACHO RACFD SACSA | WHITE       STEVE    H  SENIOR SPEC AGENT |
| RACMC SACTA RACOL RACCB | |

17. APPROVED:
    PRICE        MONTY    L  OI GRP SUPERVISOR

18. ORIGIN OFFICE: CC     | 19. TELEPHONE: 512 888 3501
    CORPUS CHRISTI - RAC   |
                            | 20. TYPIST: WHITE

---

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

Case 2:00-cv-00010   Document 1   Filed in TXSD on 01/10/2000   Page 16 of 51

O F F I C I A L   U S E   O N L Y

--------------------------------------------------------------------
           DEPARTMENT OF THE TREASURY          1. PAGE    3
           UNITED STATES CUSTOMS SERVICE       -----------------------------
                                               2. CASE NUMBER CC13MR95CC0019
    R E P O R T   O F   I N V E S T I G A T I O N   -----------------------------
            C O N T I N U A T I O N            3. REPORT NUMBER: 031
--------------------------------------------------------------------
DETAILS INVESTIGATION:

On April 12, 1995, RAIC/Corpus Christi, Texas initiated an OCDETF
investigation into the drug smuggling activities of Benito SILVA Jr. and the
Jesus ESCOBAR/Benito SILVA Jr. drug smuggling organization. This organization
was smuggling marihuana, cocaine, and heroin for at least ten years. To date,
eighteen subjects have been indicted for their participation in the drug
smuggling organization, fourteen of which have been convicted. Included in
those convicted are the leaders of the organization, ESCOBAR, and SILVA. Two
subjects remain fugitives, while one subject had charges dismissed in the
interest of the government.

Benito SILVA Jr. has been cooperating with the investigating agents and has
been interviewed on several occasions. During previous debriefings, SILVA told
agents about his uncle, Alonzo SANCHEZ's involvement in the Jesus
ESCOBAR/Benito SILVA Jr. Drug Smuggling Organization (E/SDSO).  SANCHEZ is
married to ESCOBAR's sister Elma (ESCOBAR) SANCHEZ.

According to SILVA, SANCHEZ became involved in the E/SDSO in the early to mid-
1980's.  SANCHEZ was working for Nueces Vacuum in the early 1980's and was
arrested for theft from the company.  After SANCHEZ's arrest and termination
from Nueces Vacuum, Jesus ESCOBAR recruited him into the E/SDSO.

NOTE: A query of SANCHEZ's criminal history indicates an arrest on April 30,
1982 for theft.  This entry is consistent with the information from SILVA
regarding SANCHEZ's arrest and termination from Nueces Vacuum.

SILVA stated in the early to mid-1980's Roel BENAVIDES was supplying large
quantities of marihuana to the E/SDSO.  BENAVIDES typically delivered loads of
marihuana to E/SDSO member Richard STARRY in Orange Grove, Texas. After
BENAVIDES delivered the marihuana to STARRY, SILVA and SANCHEZ transported the
marihuana from STARRY's house to SANCHEZ's house in Banquete, Texas for
storage and further distribution. SILVA said the E/SDSO was also obtaining
marihuana from Alejandro BARRERRA, and Jose Luis MORENO (deceased) at the same
time.

According to SILVA, SANCHEZ stored marihuana for about one year.  At this
time, SANCHEZ's role changed from storing marihuana to handling the E/SDSO's
money matters, as well as the storage and distribution of cocaine.

SILVA described SANCHEZ's role in the E/SDSO cocaine smuggling business.
SILVA stated SANCHEZ weighed and cut the cocaine, and then stored, or
distributed the cocaine at the direction of ESCOBAR.  (NOTE: To cut cocaine, a
person will typically add an innocuous ingredient to a small quantity of
cocaine to increase the quantity by as much as twice the original quantity of

                  O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.
                                  16

O F F I C I A L   U S E   O N L Y

--------------------------------------------------------------
DEPARTMENT OF THE TREASURY | 1. PAGE   4
UNITED STATES CUSTOMS SERVICE

2. CASE NUMBER CC13MR95CC0019

R E P O R T   O F   I N V E S T I G A T I O N
C O N T I N U A T I O N | 3. REPORT NUMBER: 031
--------------------------------------------------------------

cocaine.) SILVA said a person generally had to deal with ESCOBAR to negotiate the purchase of a quantity of cocaine. However, SANCHEZ packaged and delivered the cocaine to the prospective buyer. SANCHEZ then took the money used to purchase the cocaine and stored the money for the E/SDSO.

SILVA also said SANCHEZ was responsible for handling the finances of the E/SDSO. SANCHEZ received the money, accounted for it, and stored the money. SANCHEZ collected money from the transportation of drugs and the sale of drugs, from various violators. SILVA stated anytime someone such as Pablo GONZALEZ delivered money to SILVA, SILVA called SANCHEZ who met with SILVA, and took delivery of the money for safekeeping. SANCHEZ stored the drug smuggling proceeds at either his own home, or the home of his brother Andreas SANCHEZ.

SANCHEZ also paid for loads of marihuana, cocaine and for the transportation of drugs as he was instructed to by ESCOBAR. SANCHEZ had to keep ESCOBAR informed of payments made to whom, and for what. SANCHEZ also kept ESCOBAR apprised of the distribution of cocaine.

SILVA stated the E/SDSO had several suppliers of cocaine over the years. SILVA listed the suppliers as Saul SALINAS Sr., Saul SALINAS Jr., Pablo SALINAS (family members), Adelio LOPEZ (A.K.A. YAYO, JAJO), BLACKIE (N.F.I.), Roel Benavides, Jose Luis GARCIA, and Ernesto GONZALEZ (deceased).

NOTE: Jose Luis GARCIA during previous debriefings admitted he supplied cocaine to the E/SDSO. SA-242-CC also stated he had sold large quantities of cocaine to the E/SDSO. SA-242-CC said he delivered cocaine directly to Alonzo SANCHEZ. (For further information see R.O.I.'s CC13MR95CC0019-014, and CC13MR95CC0019-024.)

SILVA stated that Jesus ESCOBAR also distributed heroin in the early 1990's. According to SILVA, ESCOBAR received heroin from Saul SALINAS Sr. After several years, SALINAS started to supply the E/SDSO with cocaine as well. SILVA said initially, ESCOBAR handled the distribution of the heroin himself.

In 1995, ESCOBAR lost his daughter when she was involved in a fatal car accident, and his brother Rene ESCOBAR to cancer. ESCOBAR became distraught and withdrawn, and as a result, SILVA took a more active role in the E/SDSO. SILVA said he and SANCHEZ took over the distribution of heroin as partners and split the proceeds.

In February 1995, SSA Steve White, and SA Kenny Landrum interviewed Osiel GARCIA Sr., Osiel GARCIA Jr., Jorge GARCIA, Hugo GARCIA, and Gilberto GARCIA. The GARCIA's were indicted in the Middle District of Florida for drug smuggling, pled guilty and were cooperating with agents. During the

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE US CUSTOMS SERVICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

Case 2:00-cv-00010   Document 1   Filed in TXSD on 01/10/2000   Page 18 of 51

O F F I C I A L   U S E   O N L Y

-----------------------------------------------------------------------

| | |
|---|---|
| DEPARTMENT OF THE TREASURY<br>UNITED STATES CUSTOMS SERVICE | 1. PAGE    5 |
| | 2. CASE NUMBER CC13MR95CC0019 |
| R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 3. REPORT NUMBER: 031 |

-----------------------------------------------------------------------

interview's Hugo and Gilberto GARCIA told agents that their uncle, Alfredo
GARCIA, had used Albert PENA to obtain a loan from a bank in Corpus Christi,
Texas. According to the GARCIA's, Alfredo GARCIA delivered approximately
$100,000.00 in U.S. currency to PENA at his law office in Corpus Christi,
Texas.

The GARCIA's stated the money was proceeds from Alfredo GARCIA's drug
smuggling, and PENA was aware of this fact.  PENA allegedly received the money
from Alfredo GARCIA. PENA then approached the Corpus Christi National Bank
(CCNB) and negotiated a loan for GARCIA with CCNB.  GARCIA applied for a loan
of approximately $75,000.00 which PENA co-signed with Alfredo GARCIA.  The
bank loan was used by GARCIA to encumber a house GARCIA built in Roma, Texas.
In 1993 CCNB was bought out by NationsBank, with a complete turnover from CCNB
to NationsBank in 1994.

SILVA also told agents he knew there had been a meeting in which Jesus
ESCOBAR, Alfredo GARCIA and Albert PENA were present.  ESCOBAR later told
SILVA the meeting was about PENA obtaining a loan for GARCIA to encumber the
house which GARCIA was building in Roma, Texas. According to SILVA, ESCOBAR
instructed Alonzo SANCHEZ to take $125,000.00 to PENA at PENA's office to help
obtain the loan.  The loan to GARCIA was an attempt to prevent law enforcement
seizure of the house.

NOTE: SA Kathy Hubble, IRS-CID/Corpus Christi, participated in the OCDETF
investigation, obtained CCNB records from NationsBank in Corpus Christi,
Texas, which indicate the existence of a $75,000.00 loan to Alfredo GARCIA.
On April 15, 1992, PENA utilized his personal bank, CCNB, to obtain the loan
for GARCIA, which PENA co-signed.  According to CCNB records, PENA used two
'Certificates of Deposit'(CD), and one money market account as collateral for
the note. Since NationsBank took over CCNB, the records for CCNB transactions
have been difficult to obtain.  However, the records acquired to date, show
the initial loan to GARCIA which went into default in 1995.

NationsBank was required to go through a collection process in an effort to
receive payment for the GARCIA note.  Records from NationsBank show
correspondence to PENA stating the bank was going to foreclose PENA's CD's and
his money market account to pay for the GARCIA note.  On November 10, 1995,
PENA negotiated a second loan which satisfied NationsBank's collection
activities.

On November 10, 1995, the outstanding balance on the GARCIA note was
approximately $51,000.00.  After PENA negotiated the second loan to take over
the GARCIA note, the outstanding balance was approximately $27,000.00.  The
records indicate PENA made a large payment to NationsBank to reduce the
balance from $51,000.00 to $27,000.00.  However, the method of payment PENA

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY (
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT O:
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

CMPDF - www.fxxix.com

------------------------------------------------------------

DEPARTMENT OF THE TREASURY  | 1. PAGE    6
UNITED STATES CUSTOMS SERVICE

------------------------------------------------------------
| 2. CASE NUMBER CC13MR95CC0019

R E P O R T   O F   I N V E S T I G A T I O N
------------------------------------------------------------
C O N T I N U A T I O N    | 3. REPORT NUMBER: 031

------------------------------------------------------------

used is unclear.  The NationsBank records seem to indicate that PENA may have
used one of the CD's to make the payment, as one of the CD's appears to have
been liquidated.  NationsBank is still researching the two notes, and will
make the records available to agents as they receive them in Corpus Christi.


SILVA also claimed SANCHEZ continued to provided kilo quantities of cocaine to
Angel BELTRAN for the E/SDSO even after the arrest and conviction of ESCOBAR,
and SILVA.  SILVA stated SANCHEZ most likely operated at the direction of
ESCOBAR, and allegedly delivered at least one kilogram of cocaine per month to
BELTRAN.  SANCHEZ also collected the money from the sale of the cocaine to
BELTRAN.

As reported in R.O.I. # CC13MR95CC0019-0029, SILVA told SSA White of a cocaine
seizure made by a Texas Department of Public Safety, Highway Trooper near
Sinton, Texas.  SILVA stated the cocaine was for the E/SDSO, but was going to
SANCHEZ for storage, and distribution.  See R.O.I. # CC13MR95CC0019-0029 for
complete details regarding the seizure of this load of cocaine.

SSA White interviewed other cooperating members of the E/SDSO regarding their
specific knowledge of SANCHEZ's role in the drug smuggling organization.  The
results of the interviews are documented in the following R.O.I.'s,
CC13MR95CC0019-004 Interview of J.L. GARCIA RE: STARRY and SANCHEZ;
CC13MR95CC0019-016 Interview of Pablo GONZALEZ; CC13MR95CC0019-018
Photographic lineup identification of suspects; CC13MR95CC0019-023 Interview of
Jose GUZMAN; and CC13MR95CC0019-024 Interview of SA-242-CC.  SSA White also
documented a cocaine reverse investigation, and the cocaine seizure near
Sinton, Texas.  See R.O.I. # CC13MR95CC0019-022 Cocaine Reversal in April
1992, for additional details.

COLLATERAL LEADS: None.

INVESTIGATION CONTINUES:


O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

**MODEL FORM FOR MOTIONS UNDER**
**28 U.S.C. § 2255**
**(Continued)**

13.    **If any of the grounds listed in 12A and B were not previously presented, state briefly what grounds were not so presented, and give your reasons for not presenting them**: Ineffective assistance of counsel was not raised on appeal because ineffective trial counsel also handled the direct appeal in this cause and he did not raise this ground, *i.e.*, ineffective counsel on appeal.

14.    **Do you have any petition or appeal now pending in any court as to the judgment under attack? Yes [] No [x]**

15.    **Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:**

    **(a) At preliminary hearing**: Albert A. Pena, III, 4444 Corona, Suite 150, Corpus Christi, TX 78411.

    **(b) At arraignment and plea:** Same.

    **(c) At trial:** Same.

    **(d) At sentencing:** Same.

    **(e) On appeal:** Same.

    **(f) In any post-conviction proceeding:** Same.

    **(g) On appeal from any adverse ruling in a post-conviction proceeding:** Same.

16.    **Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at approximately the same time? Yes [x] No []**

17.    **Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack? Yes [] No [x]**

    **(a) If so, give name and location of court which imposed sentence to be served in the future:** N/A.

    **(b) And give date and length of sentence to be served in the future:** N/A.

    **(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future? Yes [] No [] N/A.**

CutePDF - www.tesite.com

Wherefore, movant prays that the Court grant him all relief to which he may be entitled in this

proceeding.

_____

**SCOTT M. ELLISON**
State Bar No. 00787432

**LAW OFFICES OF SCOTT M. ELLISON**
1116 Santa Fe St.
Corpus Christi, TX 78404
Telephone: (361) 887-7600
Telecopier: (361) 882-4728

I declare under penalty or perjury that the foregoing is true and correct.

Executed on: _1 - 6 - 00_____

_____

**Jesus Jose Escobar**
68900-079
**P.O. Box 4200**
**Three Rivers, TX 78071**

21

O F F I C I A L   U S E   O N L Y

--------------------------------------------------------------
      DEPARTMENT OF THE TREASURY          1. PAGE    6
      UNITED STATES CUSTOMS SERVICE    --------------------------------
                                          2. CASE NUMBER CC13MR95CC0019
  R E P O R T   O F   I N V E S T I G A T I O N  --------------------------------
      C O N T I N U A T I O N              3. REPORT NUMBER: 031
--------------------------------------------------------------

used is unclear.  The NationsBank records seem to indicate that PENA may have
used one of the CD's to make the payment, as one of the CD's appears to have
been liquidated.  NationsBank is still researching the two notes, and will
make the records available to agents as they receive them in Corpus Christi.

SILVA also claimed SANCHEZ continued to provided kilo quantities of cocaine to
Angel BELTRAN for the E/SDSO even after the arrest and conviction of ESCOBAR,
and SILVA.  SILVA stated SANCHEZ most likely operated at the direction of
ESCOBAR, and allegedly delivered at least one kilogram of cocaine per month to
BELTRAN.  SANCHEZ also collected the money from the sale of the cocaine to
BELTRAN.

As reported in R.O.I. # CC13MR95CC0019-0029, SILVA told SSA White of a cocaine
seizure made by a Texas Department of Public Safety, Highway Trooper near
Sinton, Texas.  SILVA stated the cocaine was for the E/SDSO, but was going to
SANCHEZ for storage, and distribution.  See R.O.I. # CC13MR95CC0019-0029 for
complete details regarding the seizure of this load of cocaine.

SSA White interviewed other cooperating members of the E/SDSO regarding their
specific knowledge of SANCHEZ's role in the drug smuggling organization.  The
results of the interviews are documented in the following R.O.I.'s,
CC13MR95CC0019-004 Interview of J.L. GARCIA RE: STARRY and SANCHEZ;
CC13MR95CC0019-016 Interview of Pablo GONZALEZ; CC13MR95CC0019-018
Photographic lineup identification of suspects; CC13MR95CC0019-023 Interview of
Jose GUZMAN; and CC13MR95CC0019-024 Interview of SA-242-CC.  SSA White also
documented a cocaine reverse investigation, and the cocaine seizure near
Sinton, Texas.  See R.O.I. # CC13MR95CC0019-022 Cocaine Reversal in April
1992, for additional details.

COLLATERAL LEADS: None.

INVESTIGATION CONTINUES:

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

------------------------------------------------------------------
DEPARTMENT OF THE TREASURY | 1. PAGE    5
UNITED STATES CUSTOMS SERVICE
------------------------------------------------
2. CASE NUMBER CC13MR95CC0019

R E P O R T   O F   I N V E S T I G A T I O N     ------------------------------------------------
C O N T I N U A T I O N              | 3. REPORT NUMBER: 031
------------------------------------------------------------------

interview's Hugo and Gilberto GARCIA told agents that their uncle, Alfredo
GARCIA, had used Albert PENA to obtain a loan from a bank in Corpus Christi,
Texas.  According to the GARCIA's, Alfredo GARCIA delivered approximately
$100,000.00 in U.S. currency to PENA at his law office in Corpus Christi,
Texas.

The GARCIA's stated the money was proceeds from Alfredo GARCIA's drug
smuggling, and PENA was aware of this fact.  PENA allegedly received the money
from Alfredo GARCIA. PENA then approached the Corpus Christi National Bank
(CCNB) and negotiated a loan for GARCIA with CCNB.  GARCIA applied for a loan
of approximately $75,000.00 which PENA co-signed with Alfredo GARCIA.  The
bank loan was used by GARCIA to encumber a house GARCIA built in Roma, Texas.
In 1993 CCNB was bought out by NationsBank, with a complete turnover from CCNB
to NationsBank in 1994.

SILVA also told agents he knew there had been a meeting in which Jesus
ESCOBAR, Alfredo GARCIA and Albert PENA were present.  ESCOBAR later told
SILVA the meeting was about PENA obtaining a loan for GARCIA to encumber the
house which GARCIA was building in Roma, Texas. According to SILVA, ESCOBAR
instructed Alonzo SANCHEZ to take $125,000.00 to PENA at PENA's office to help
obtain the loan.  The loan to GARCIA was an attempt to prevent law enforcement
seizure of the house.

NOTE: SA Kathy Hubble, IRS-CID/Corpus Christi, participated in the OCDETF
investigation, obtained CCNB records from NationsBank in Corpus Christi,
Texas, which indicate the existence of a $75,000.00 loan to Alfredo GARCIA.
On April 15, 1992, PENA utilized his personal bank, CCNB, to obtain the loan
for GARCIA, which PENA co-signed.  According to CCNB records, PENA used two
'Certificates of Deposit'(CD), and one money market account as collateral for
the note. Since NationsBank took over CCNB, the records for CCNB transactions
have been difficult to obtain.  However, the records acquired to date, show
the initial loan to GARCIA which went into default in 1995.

NationsBank was required to go through a collection process in an effort to
receive payment for the GARCIA note.  Records from NationsBank show
correspondence to PENA stating the bank was going to foreclose PENA's CD's and
his money market account to pay for the GARCIA note.  On November 10, 1995,
PENA negotiated a second loan which satisfied NationsBank's collection
activities.

On November 10, 1995, the outstanding balance on the GARCIA note was
approximately $51,000.00.  After PENA negotiated the second loan to take over
the GARCIA note, the outstanding balance was approximately $27,000.00.  The
records indicate PENA made a large payment to NationsBank to reduce the
balance from $51,000.00 to $27,000.00.  However, the method of payment PENA

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT O
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

--------------------------------------------------------------------------
DEPARTMENT OF THE TREASURY
UNITED STATES CUSTOMS SERVICE

R E P O R T   O F   I N V E S T I G A T I O N
C O N T I N U A T I O N

1. PAGE    4

2. CASE NUMBER CC13MR95CC0019

3. REPORT NUMBER: 031
--------------------------------------------------------------------------

cocaine.) SILVA said a person generally had to deal with ESCOBAR to negotiate
the purchase of a quantity of cocaine. However, SANCHEZ packaged and delivered
the cocaine to the prospective buyer. SANCHEZ then took the money used to
purchase the cocaine and stored the money for the E/SDSO.

SILVA also said SANCHEZ was responsible for handling the finances of the
E/SDSO. SANCHEZ received the money, accounted for it, and stored the money.
SANCHEZ collected money from the transportation of drugs and the sale of
drugs, from various violators. SILVA stated anytime someone such as Pablo
GONZALEZ delivered money to SILVA, SILVA called SANCHEZ who met with SILVA,
and took delivery of the money for safekeeping. SANCHEZ stored the drug
smuggling proceeds at either his own home, or the home of his brother Andreas
SANCHEZ.

SANCHEZ also paid for loads of marihuana, cocaine and for the transportation
of drugs as he was instructed to by ESCOBAR.  SANCHEZ had to keep ESCOBAR
informed of payments made to whom, and for what. SANCHEZ also kept ESCOBAR
apprised of the distribution of cocaine.

SILVA stated the E/SDSO had several suppliers of cocaine over the years. SILVA
listed the suppliers as Saul SALINAS Sr., Saul SALINAS Jr., Pablo SALINAS
(family members), Adelio LOPEZ (A.K.A. YAYO, JAJO), BLACKIE (N.F.I.), Roel
Benavides, Jose Luis GARCIA, and Ernesto GONZALEZ (deceased).

NOTE: Jose Luis GARCIA during previous debriefings admitted he supplied
cocaine to the E/SDSO.  SA-242-CC also stated he had sold large quantities of
cocaine to the E/SDSO.  SA-242-CC said he delivered cocaine directly to Alonzo
SANCHEZ.  (For further information see R.O.I.'s CC13MR95CC0019-014, and
CC13MR95CC0019-024.)

SILVA stated that Jesus ESCOBAR also distributed heroin in the early 1990's.
According to SILVA, ESCOBAR received heroin from Saul SALINAS Sr.  After
several years, SALINAS started to supply the E/SDSO with cocaine as well.
SILVA said initially, ESCOBAR handled the distribution of the heroin himself.

In 1995, ESCOBAR lost his daughter when she was involved in a fatal car
accident, and his brother Rene ESCOBAR to cancer.  ESCOBAR became distraught
and withdrawn, and as a result, SILVA took a more active role in the E/SDSO.
SILVA said he and SANCHEZ took over the distribution of heroin as partners and
split the proceeds.

In February 1995, SSA Steve White, and SA Kenny Landrum interviewed Osiel
GARCIA Sr., Osiel GARCIA Jr., Jorge GARCIA, Hugo GARCIA, and Gilberto GARCIA.
The GARCIA's were indicted in the Middle District of Florida for drug
smuggling, pled guilty and were cooperating with agents.  During the

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

-----------------------------------------------------------------

| DEPARTMENT OF THE TREASURY | 1. PAGE   3 |
| UNITED STATES CUSTOMS SERVICE | |
| | 2. CASE NUMBER CC13MR95CC0019 |
| R E P O R T   O F   I N V E S T I G A T I O N | |
| C O N T I N U A T I O N | 3. REPORT NUMBER: 031 |

-----------------------------------------------------------------

DETAILS INVESTIGATION:

On April 12, 1995, RAIC/Corpus Christi, Texas initiated an OCDETF
investigation into the drug smuggling activities of Benito SILVA Jr. and the
Jesus ESCOBAR/Benito SILVA Jr. drug smuggling organization. This organization
was smuggling marihuana, cocaine, and heroin for at least ten years. To date,
eighteen subjects have been indicted for their participation in the drug
smuggling organization, fourteen of which have been convicted. Included in
those convicted are the leaders of the organization, ESCOBAR, and SILVA. Two
subjects remain fugitives, while one subject had charges dismissed in the
interest of the government.

Benito SILVA Jr. has been cooperating with the investigating agents and has
been interviewed on several occasions. During previous debriefings, SILVA told
agents about his uncle, Alonzo SANCHEZ's involvement in the Jesus
ESCOBAR/Benito SILVA Jr. Drug Smuggling Organization (E/SDSO).  SANCHEZ is
married to ESCOBAR's sister Elma (ESCOBAR) SANCHEZ.

According to SILVA, SANCHEZ became involved in the E/SDSO in the early to mid-
1980's.  SANCHEZ was working for Nueces Vacuum in the early 1980's and was
arrested for theft from the company.  After SANCHEZ's arrest and termination
from Nueces Vacuum, Jesus ESCOBAR recruited him into the E/SDSO.

NOTE: A query of SANCHEZ's criminal history indicates an arrest on April 30,
1982 for theft.  This entry is consistent with the information from SILVA
regarding SANCHEZ's arrest and termination from Nueces Vacuum.

SILVA stated in the early to mid-1980's Roel BENAVIDES was supplying large
quantities of marihuana to the E/SDSO.  BENAVIDES typically delivered loads of
marihuana to E/SDSO member Richard STARRY in Orange Grove, Texas. After
BENAVIDES delivered the marihuana to STARRY, SILVA and SANCHEZ transported the
marihuana from STARRY's house to SANCHEZ's house in Banquete, Texas for
storage and further distribution. SILVA said the E/SDSO was also obtaining
marihuana from Alejandro BARRERRA, and Jose Luis MORENO (deceased) at the same
time.

According to SILVA, SANCHEZ stored marihuana for about one year.  At this
time, SANCHEZ's role changed from storing marihuana to handling the E/SDSO's
money matters, as well as the storage and distribution of cocaine.

SILVA described SANCHEZ's role in the E/SDSO cocaine smuggling business.
SILVA stated SANCHEZ weighed and cut the cocaine, and then stored, or
distributed the cocaine at the direction of ESCOBAR.  (NOTE: To cut cocaine, a
person will typically add an innocuous ingredient to a small quantity of
cocaine to increase the quantity by as much as twice the original quantity of

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

REQUESTED BY:  WHITE, STEVE H
O F F I C I A L   U S E   O N L Y

----------------------------------------------------------------
DEPARTMENT OF THE TREASURY | 1. TECS ACCESS CODE 3
UNITED STATES CUSTOMS SERVICE

R E P O R T   O F   I N V E S T I G A T I O N | 2. PAGE    1

| 3. CASE NUMBER CC13MR95CC0019
      OCDETF NO:  SW-TXS-201

4. TITLE: BENITO SILVA JR.
----------------------------------------------------------------
5. CASE STATUS:    INTERIM RPT
----------------------------------------------------------------

| 6. REPORT DATE | 7. DATE ASSIGNED | 8. CLASS | 9. PROGRAM CODE | 10. REPORT NO. |
|---|---|---|---|---|
| 012599 | 032295 | 1 | 210 | 031 |

11. RELATED CASE NUMBERS:    CC13MR94CC0011  C13CS90CC0045   CB13MR92CB0014
    CC02CR92CC0004   FD02HE91FD0003
----------------------------------------------------------------
12. COLLATERAL REQ:
----------------------------------------------------------------
13. TYPE OF REPORT:
    INVESTIGATIVE FINDINGS / MEMO OF INTERVIEW
----------------------------------------------------------------
TOPIC: ALONZO SANCHEZ
----------------------------------------------------------------
14. SYNOPSIS:
On April 12, 1995, RAIC/Corpus Christi, Texas initiated an OCDETF
investigation into the drug smuggling activities of Benito SILVA Jr. and the
Jesus ESCOBAR/Benito SILVA Jr. drug smuggling organization. This organization
was smuggling marihuana, cocaine, and heroin for at least ten years. To date,
eighteen subjects have been indicted for their participation in the drug
smuggling organization, fourteen of which have been convicted. Included in
those convicted are the leaders of the organization, ESCOBAR, and SILVA. Two
subjects remain fugitives, while one subject had charges dismissed in the
interest of the government.

Benito SILVA Jr. has been cooperating with the investigating agents and has
been interviewed on several occasions. During previous debriefings, SILVA told
agents about his uncle, Alonzo SANCHEZ's involvement in the drug smuggling
conspiracy. This R.O.I. documents SILVA's information regarding SANCHEZ.

----------------------------------------------------------------
| 15. DISTRIBUTION: | 16. SIGNATURE: |
| RACCC SACHO RACFD SACSA | WHITE        STEVE   H SENIOR SPEC AGENT |
| RACMC SACTA RACOL RACCB | |
| | 17. APPROVED: |
| | PRICE        MONTY    L OI GRP SUPERVISOR |

| 18. ORIGIN OFFICE: CC | 19. TELEPHONE: 512 888 3501 |
| CORPUS CHRISTI - RAC | |
| | 20. TYPIST: WHITE |
----------------------------------------------------------------
O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF
THE US CUSTOMS SERVICE.  ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR
INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO HEADQUARTERS, US CUSTOMS
SERVICE TOGETHER WITH A COPY OF THE DOCUMENT.

**EXHIBIT C**

25

CVisPDF – www.fastio.com™

Case 2:00-cv-00010   Document 1   Filed in TXSD on 01/10/2000   Page 28 of 51

USA _____ VS. Escobar _____

PROCEEDING: _____ FPTC _____

DATE: SEP 2 3 1996 _____

Escobar answers that he does not want Jones as an attorney on that issue. Jones is excused from court room.

Gov stipulation in writing on marijuana ~~evidence amount~~ + title histories of vehicles; no obj from all parties. The Court admonishes all 3 defts on stipulations. All stipulations admitted. Gov states that marijuana samples will not be ~~admitted~~ introduced : Gx # 30, 40, & 49. Obj by Def Atty f/ Escobar to Gx #55. Gov requests having 2 case agents at table with him; no obj from parties; granted. Case agents are Steve White + David Gonzales. The Court does not want redacted indictment. Gov will be dismissing count 10 on Escobar; court ~~its~~ grants dismissal motion. Def Atty asks court to allow Catherine Dlinger to sit at his def table; no obj from gov; granted. Parties excused until 9:00 am  9-24-96 for jury selection.

Case 2:00-cv-00010   Document 1   Filed in TXSD on 01/10/2000   Page 29 of 51

PAGE: __3__   CA/CR ).: __C96-84__

__USA__   vs. __Escobar__

PROCEEDING: __FPTC__

DATE: SEP 2 3 1996

Brief recess. — when recall Court will tal about issue of murders. The Court will consider the in camera issue after recess

Case recalled at 10:45 am. The Court will hear "in camera" discussion in open courtroom. All spectators + parties are excused except for Pena + Escobar. Pena states that Deft is being harassed by Gov. Escobar is was on probation for previous conviction. Def Atty Pena states that gov agent stated that Pena bribed the Court (Quada in previous case in order to get probation. to Pena states that former co-deft Salvador Rodriguez gave that info to gov agent Rene A

Discussion of murder evidence in Florida.

The Court will take up issues of exhibits + stipulations at 3:00 today

Case recalled at 3:15 pm. Court appoints Grant Jones to speak w/ Escobar to find out if there are reasons that Pena not be his lawyer.

23

CtrlPDF - www.fasoo.com

Case 2:00-cv-00010   Document 1   Filed in TXSD on 01/10/2000   Page 30 of 51

Gov states that he will not bring up the issue of Pena's cocaine purchase. They will not bring charges against Pena. Gov will instruct witnesses that they are not to bring up name of Pena. Deft Escobar states he was not aware of issue of money laundering. The Court offers atty so that Deft can discuss issue of having Pena as lawyer; he refuses. Def atty Pena states he thinks that it would be reasonable to do. Gov has no obj to Pena as atty. Gov will not move to disqualify Pena as atty because he feels that it is Escobar's decision. That issue will not be brought up by Gov during trial. Court orders all parties about matters discussed about allegations of Silva* *about Pena shall not be discussed during trial; no obj by parties. Def Atty Pena asks to meet with Court in camera about other issues. Gov oral motion suppress regarding evidence on any murders deft involved in & bring up to court before bringing it up:

22

JUDGE PRESIDING: ___ HUBEN W. HEAD, JR. ___

COURTROOM CLERK: ___ Judith F. Alvarez ___

COURT RECORDER: ___ Lori Lopez ___

LAW CLERK: _____

U. S. P. O.: _Glenn Reinicke_ / USPT: _Alma Irr_

U.S. MARSHAL: _James Torres_

INTERPRETER: _____

FILED

SEP 23 1996

Michael N. Milby
Clerk of Court

DATE: September 23, 1996    OPEN: 8:35 am   ADJOURN: 8:36 am
                                    9:16 am  —  9:58 am.
TAPE: 1                              10:45 am  —  11:36 am
CRIM ACTION NO.: CR-C-96-84 (1)      3:15 pm  —  3:49 pm

UNITED STATES OF AMERICA    )   COUNSEL: Charles Dause

_____   )            Eric Reed

VS.

JESUS JOSE ESCOBAR          )   COUNSEL: Albert Pena

_____   )   _____

Case called for FINAL PRETRIAL CONFERENCE. Discussion of issue of Def Atty Pena being a potential deft because co-defts. sold him drugs. Gov does not intend to use it during trial. Def Atty asks court to ask Escobar "in camera" ~~ask him~~ if he is willing to continue with Pena in jury trial. The Court asks Deft Escobar in open court if he wants to continue with Pena; deft answers yes. Deft does not want to talk to any other lawyers. Deft states that he will not bring up later the issue of a 2255 claim because gov would prosecute if deft atty did not put up good def.

21

Case 2:00-cv-00010   Document 1   Filed in TXSD on 01/10/2000   Page 32 of 51

The Gov states that the paperwork on Garcia issue cannot be vouched by Gov.

Def Atty May has objection to exhibit of Border Patrol Crossing ~~by~~ entry report of crossing of Pablo Gonzalez & Benny Silva. Court takes notes of exhibit & will rule during trial. The Court will take up issues of stipulations & exhibits at 3:00 pm. today.

Case recalled at 3:15 pm. The Court has appointed Grant Jones for Escobar on issues of Pena as def atty. Gov stipulates in writing on drug evidence & title histories; no obj from all parties. The Court admonishes all 3 defts on stipulations. Stipulations admitted. Def Atty ~~J~~ Gonzalez objects to GX #10 + 54.

Def Atty amends his witness list to include Gilbert Gonzalez & Juan Hernandez, no obj from Gov; granted. Parties excused until 9:00 am 9-24-96 for jury selection.

PAGE: 2   EA/CR NO.: C96-84(4)

USA vs. Gonzales

PROCEEDING: 7PTC

DATE: SEP 2 3 1996

Def Atty May states no agreements on phone records. Court asks parties to return at 1:15 pm. After a brief recess, court will take up the issue of murder evidence.

Case recalled at at 10:54 am. The Court explains the substance of the in camera hearing with Escobar & Def Atty. Discussion of murder evidence in Florida. Def Atty thinks that evidence will give Deft Benny Silva a motive to testify so that he will not be charged for the murder in Florida. Court grants Deft's motion in limine. Arguments heard. Court wants out of court hearing with Silva & witnesses during trial sometime at end of day. Discussion of 2nd murder by Jose Luis Garcia who will testify in trial. There is no plea agreement with respect to Garcia. #Court states that Garcia should be put on stand outside presence of jury.

19

JUDGE PRESIDING: HAYDEN W. HEAD, JR.

COURTROOM CLERK: Judith F. Alvarez

COURT RECORDER: Lori Lopez

LAW CLERK: _____

U. S. P. O.: Glenn Reinike / USPT: Alma Irr

U S. MARSHAL: James Torrey

INTERPRETER: _____

DATE: September 23, 1996    OPEN: 8:35 am  ADJOURN: 8:36 am
TAPE: 1                             9:12 am  —  9:58 am
                                   10:54 am  —  11:36 am.
CRIM ACTION NO.: CR-C-96-84 (4)    3:15 pm  —  3:49 pm

United States District Court
Southern District of Texas
FILED

SEP 23 1996

Michael N. Milby
Clerk of Court

UNITED STATES OF AMERICA )  COUNSEL: Charles Dause

_____ )          Eric Reed

VS.

PABLO GONZALEZ )  COUNSEL: Bill May

===========================================================

Case called for FINAL PRETRIAL CONFERENCE. Gonzalez role was responsible for storage of marij from 92-94. Deft Mtn for Disclosure of Impeachment Evidence ;granted. No other motions. Def Atty states that he will work out stipulations on seizure evidence. Def Atty states that he will question co-deft Silva about lack of cocaine charges without going into Peña's issue. Gov will not bring up issue. & will not be charging Pena for on issue. Def atty will instruct witnesses not to bring up Pena's name. Def Atty states that tape of Carranza bringing up issue of. giving money to Pena for laundering was given to him late & did not know about it.

18

**EXHIBIT B**

17

It was a catch 22 for me as a result of my divided loyalty.

6.      I will testify to the foregoing under oath.

7.      I have read the foregoing and state that the facts are based on my personal knowledge and are true and correct.

**WITNESS MY HAND** this _7th_ day of ___October___, 1999.

Albert A. Pena, III
4444 Corona, Suite 150
Corpus Christi, TX 78411

**THE STATE OF TEXAS**     §
**COUNTY OF NUECES**      §

    **BEFORE ME,** the undersigned authority, on this day personally appeared Albert A. Pena, III, known to me to be the person whose name is subscribed to the foregoing instrument, and after being duly sworn by me, did state upon his oath that the facts contained in said instrument are true and correct.

    **SUBSCRIBED AND SWORN TO** before me, on this _7th_ day of ~~September~~ October, 1999, to certify which witness my hand and seal of office.

LEOPOLDO SANCHEZ, JR.
MY COMMISSION EXPIRES
July 17, 2003

Notary Public in and for the State of Texas

16

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA | * | |
| | * | |
| VS. | * | CRIMINAL NO. C-96-84 |
| | * | |
| JESUS ESCOBAR | * | |

## AFFIDAVIT OF ALBERT A. PENA, III

I, Albert A. Pena, III, being first duly sworn according to law, depose and say as follows:

1.     I am an attorney practicing criminal law in the Southern District of Texas.

2.     During and between 3-12-96 thru 12-20-96, including critical stages of the criminal proceedings and the pretrial process of Mr. Escobar's case, I represented Mr. Escobar. At the same time, I simultaneously represented the interests of Manuel Guerra, a co-defendant in this indictment.

3.     During and between 3-12-96 thru 12-20-96, including critical stages of the criminal proceedings and the pretrial, trial, and sentencing process of Mr. Escobar's case, I represented Mr. Escobar. At the same time, I simultaneously represented my own personal interest to not be charged for possessing or dealing cocaine as alleged by prosecution witness Benito Silva. More specifically, while ostensibly representing Mr. Escobar, I had a duty of loyalty to my own personal interest to not be charged for possessing cocaine as alleged by  prosecution witness Benito Silva.

4.     During and between 3-12-96 thru 12-20-96, including critical stages of the criminal proceedings and the pretrial, trial, and sentencing process of Mr. Escobar's case, the interests of Manuel Guerra, my own personal interest to not be charged for possessing or dealing cocaine, and the interests of Mr. Escobar were inconsistent, in conflict and did diverge with respect to material factual and legal issues as well as to favorable and/or appropriate courses of action. More specifically, at arraignment, I could not advise Mr. Escobar to plead guilty and accept responsibility because his disclosures would have potentially adversely affected Manuel Guerra. At the same time, I could not advise Manuel Guerra to plead guilty and accept responsibility because his disclosures would have potentially adversely affected Mr. Escobar.

5.     Additionally, at trial, I could have and should have conducted a more aggressive defense of Mr. Escobar by directly attacking the credibility of Benito Silva through cross examination which explored Silva's statements that he'd sold cocaine to me. This cross examination would have demonstrated to the jury what a liar that Silva was and how unbelievable his other testimony therefore was also. At the same time that I should have been attacking the credibility of Silva through cross examination about his statements that he'd sold cocaine to me, I was prevented from such an attack because either too aggressive of an attack, or an unsuccessful attack, would potentially have caused the prosecutor to bring charges against me for the cocaine transactions I was allegedly involved in.

**EXHIBIT A**

14

CutePDF – www.fanini.com

**APPENDIX**

13

States Constitution.

Respectfully submitted,

_____
SCOTT M. ELLISON
State Bar No. 00787432

**LAW OFFICES OF SCOTT M. ELLISON**
1116 Santa Fe St.
Corpus Christi, TX 78404
Telephone: (361) 887-7600
Telecopier: (361) 882-4728

**ATTORNEY FOR PETITIONER,**
**JOSE JESUS ESCOBAR**

trial counsel who was an indicted co-conspirator.  The Court in <u>Snyder</u> stated "An accused's right to waive conflict-free representation may not be absolute.  Where the conflict of interest was so serious as to render a trial inherently unfair, we have held that the accused has been deprived of his right to effective assistance of counsel.  <u>Snyder</u>, at 145, *citing* <u>Uptain v. United States</u>, 692 F.2d 8, 10 (5th Cir. 1982); *See also*, <u>United States v. Salinas</u>, 618 F.2d 1092, 1093 (5th Cir.), *cert. denied*, 449 U.S. 961 (1980) (attorney who was target of an investigation relating to the same offense in which he was representing his client properly disqualified in view of public interest in fair administration of justice).  In the instant case, the Trial Court should have disqualified Albert Peña.

## CONCLUSION

For the reasons set forth and discussed above, the Petitioner submits that he was denied his Sixth Amendment right to the effective assistance of counsel and that he has established this claim herein as a matter of law.  Nonetheless, if this Court requires further development of the record prior to ruling, Petitioner submits that he has demonstrated his entitlement to a hearing pursuant to the Rules Governing Section 2255 Proceedings, Rule 8.  *See also*, <u>Perillo</u>, *supra*, at 444.

At any rate, summary dismissal of a petition for federal habeas corpus relief shall not be appropriate unless the petition is "patently frivolous or false," <u>Pennsylvia *ex rel.* Herman v. Claudy</u>, 350 U.S. 116 (1956); or "vague, conclusory, or palpably incredible."  <u>Machibroda v. United States</u>, 368 U.S. 487 (1962).

Petitioner submits that this Motion to Vacate Sentence should in all things be granted, and that he be afforded a fair trial with effective assistance of counsel pursuant to the United

11

Rule 1A of the U.S. District Court for the Southern District of Texas adopts, as the minimum, the standard for the practice of law as that established by the State of Texas in its Texas Disciplinary Rules of Professional Conduct. Fed. R. P., App. A, R. 1A [local rules], U.S. Dist. Ct., S. Dist. Tex.

Texas Disciplinary Rule 1.06 (e) provides that a lawyer who accepts professional representation, with a conflict, upon discovery, should immediately withdraw. Comment 5 following this rule provides that a lawyer's own interests should not be permitted to have an adverse impact on the client....If a lawyer's own conduct in a transaction is in question, it may be difficult for the lawyer to give the client detached advice. A lawyer should not allow related business interests to affect representation.

And, Rule 10 of the U.S. District Court for the Southern District of Texas grants district court judges inherent power to regulate the lawyers practicing in front of them. Fed. R. P., App. A, R. 10, [local rules], U. S. Dist. Ct., S. Dist. Tex. That power has even allowed a district judge to remove the attorney of the defendant's choice in a criminal matter, when it is discovered that the lawyer is involved in the criminal matter before the district court. *E.g.*, Snyder, *supra*. A federal district judge has the power to remove a criminal defense attorney from a case, thereby denying an accused the right to his or her most-favored attorney, when the trial court finds a conflict of interest so great that it is likely to deny either the government or the defendant a fair trial. *Id.*

A waiver of a conflict of interest does not eliminate a court's responsibility to balance the right to one's own counsel with the court's interest in preserving the integrity and fair administration of justice. In Snyder, the Fifth Circuit upheld the trial court's disqualification of

10

potential hazards to his defense by continuing with such counsel under the onus of a conflict; and

(3) is aware of his right to obtain other counsel. *See also*, United States v. Casiano, 929 F.2d

1046, 1052 (5th Cir. 1991).

Based on the attached docket entries, it appears that the trial judge did conduct some

semblance of a *Garcia Hearing* in the instant case. Nonetheless, the Petitioner submits that the

Court did not do enough to guarantee Petitioner the effective assistance of counsel when the trial

court either failed or refused to disqualify Albert A. Peña, III. *See* United States v. Levy, 25

F.3d 146, 153 (2nd Cir. 1994). The trial court judge had a duty to remove trial counsel once the

judge discovered the actual conflict of interest that is reflected in the attached Exhibits. No

remedy short of disqualification of counsel would have been adequate. Any waiver under these

circumstances could not have been deemed voluntary. United States v. White, 706 F.2d 506 (5th

Cir. 1983).

Although Petitioner maintains that he did not "knowingly, intelligently, and

unambiguously" waive his right to conflict-free counsel, and that he was not afforded a full and

proper *Garcia Hearing*, Petitioner also submits that the conflict of trial counsel in this case was

so egregious that it could not be waived. United States v. Vaquero, 997 F.2d 78, 90 (5th Cir.

1993), *cert. denied,* 510 U.S. 1016 (1993).

It should be noted that a federal district judge has the power to remove a criminal defense

attorney from a case, thereby denying an accused the right to his or her most-favored attorney,

when the trial court finds a conflict of interest so great that it is likely to deny either the

government or the defendant a fair trial. *See* Wheat v. United States, 486 U.S. 153 (1988);

United States v. Snyder, 707 F.2d 139 (5th Cir. 1983).

9

that he was adversely affected by trial counsel's irreconcilable conflict of interest and was, therefore, denied effective assistance of counsel.

The final issue to be resolved in determining if Petitioner is entitled to the relief sought in this Writ, is whether or not Escobar waived, or could waive the conflict of interest of his trial counsel. It has long been held that, like the right to counsel of any kind, the right to conflict-free counsel can be waived. United States v. Howton, 688 F.2d 272, 274 (5th Cir. 1982). However, in United States v. Hughes, 817 F.2d 268 (5th Cir. 1987), *cert. denied*, 484 U.S. 858 (1987), the Fifth Circuit held that although a defendant may waive his right to effective assistance of counsel for the sake of being jointly represented by his chosen counsel with a potential conflict of interest, he must make the waiver knowingly, intelligently, and unambiguously. In the instant case, evidence adduced at a hearing on this Petition, if a hearing is deemed necessary, will demonstrate that Petitioner herein was heavily sedated under the influence of drugs at the time he ostensibly waived Peña's conflict during the *in camera* discussion addressed in the docket entries attached as an Exhibit to this Writ. Counsel for Petitioner has obtained information regarding the termination of two Nueces County Deputy Sheriffs employed at the County Jail after it was discovered that they were smuggling drugs to Petitioner in his cell. Jail records, which will be subpoenaed for a hearing on this Writ, will substantiate not only these jailer terminations, but also the fact that Petitioner's cell was raided and quantities of mind-altering drugs were seized therefrom during the period when Petitioner ostensibly made any waiver of a conflict of interest.

Furthermore, in United States v. Garcia, 517 F.2d 272 (5th Cir. 1975), the Fifth Circuit instructed trial courts in this circuit to conduct a hearing, now commonly known as a *Garcia Hearing*, to ensure that the defendant (1) is aware that a conflict of interest exists; (2) realizes the

8

advocate for his client and a witness on his client's behalf.  N.Y.Jud.Law, DR 5-102(A) (McKinney 1993).  And, in questioning a witness concerning his allegations against the attorney, the attorney effectively becomes an unsworn witness." <u>Fulton</u>, at 610.

Nevertheless, it is apparent that the Fifth Circuit does require an "adverse effect" showing.  *E.g.,* <u>United States v. Greig</u>, 967 F.2d 1018 (5th Cir. 1992).  In examining the record for "adverse effect" in <u>Greig</u>, the Court reasoned that "throughout Greig's trial, counsel must have been plagued by fear of sanctions, which could, as they actually did, result in disbarment in the Western District.  Added to that was the uncertainty of whether he would be indicted for obstruction of justice."  *Id.*, at 1024.  The Court went on to find that trial counsel did not vigorously defend his client because of his own necessity of avoiding incrimination.  *Id.*

Similarly, in <u>Government of Virgin Islands v. Zepp</u>, *supra,* at 139, the Court found that the trial attorney's potential criminal liability necessarily created an "adverse effect" and the resulting prejudice was "clear and unequivocal."  And in <u>Mannhalt v. Reed</u>, 847 F.2d 576 (9th Cir. 1988), *cert. denied*, 488 U.S. 908 (1988), the Court found "adverse effect" based on the trial attorney's failure to testify to rebut a co-defendant's allegations that the trial attorney was involved in the same criminal activity as his client, the trial attorney's weak cross-examination of that co-defendant, the trial attorney's failure to question his client on direct about the allegations, and trial counsel's failure to explore possible plea bargains.  *Id.,* at 581.

In the instant case, Albert Peña **admits** in his affidavit that his concern about his own welfare adversely affected his representation and limited his cross-examination.  Peña's admitted compromised representation is substantiated in the Exhibits attached hereto.  Petitioner submits

7

point with the case *sub judice*.  <u>Fulton</u> sets out an in-depth analysis of the application of the **Cuyler Standard** in the situation where a defendant's counsel is implicated for being involved in the criminal activity for which the defendant is being prosecuted.  Interestingly, the Second Circuit includes such a situation as one of two in which a *per se* violation of the Sixth Amendment <u>does</u> apply (*c.f.,* <u>Beets</u>) and a Petitioner need not make an "adverse effect" showing under the **Cuyler Standard**.  As pointed out in Fulton,

> "When a government witness alleges that the defendant's counsel engaged in criminal conduct related to the charges for which the defendant is on trial, it creates one of two actual conflicts.  First, if the allegations are true, concerns we expressed in <u>Cancilla</u> arise: the attorney may fear that a spirited defense could uncover convincing evidence of the attorney's guilt or provoke the government into action against the attorney.  Moreover, the attorney is not in a position to give unbiased advice to the client about such matters as whether or not to testify or to plead guilty and cooperate since such testimony or cooperation from the defendant may unearth evidence against the attorney.  *See* <u>Cancilla</u>, 725 F.2d at 870, *see also*, <u>Mannhalt</u> 847 F.2d at 581.
>
> Second, even if the attorney is demonstrably innocent and the government witness's allegations are plainly false, the defense is impaired because vital cross-examination becomes unavailable to the defendant.  Ordinarily, a witness's blatantly false allegations provide a rich source for cross-examination designed to cast doubt on the witness's credibility; but, when the allegations are against the defendant's attorney, this source cannot be tapped.  An attorney cannot act both as

6

attached hereto, are sufficient to establish that an actual conflict of interest existed in this case and provide the supporting facts that are a requisite for this Writ. It is interesting to note that the government did not deny or dispute the fact that Peña was the target of an investigation. The government simply did not object to the Petitioner continuing to trial without effective assistance of counsel. How better to obtain a conviction than to proceed to trial with the accused being represented by counsel whose representation was compromised and who was afraid to zealously cross-examine his own co-conspirators for fear his own drug and money laundering activities would be prosecuted? In fact, the government should have moved to disqualify Albert Peña as counsel and , as will be discussed, the Court should have granted such disqualification in order to preserve the integrity of the judicial process.

In Perillo v. Johnson, *supra*, the Fifth Circuit Court of Appeals set out the burden that must be established by the Petitioner in order to be entitled to federal habeas corpus relief when an actual conflict of interest is shown. Citing Cuyler, the Fifth Circuit stated that "A Petitioner need only show that his attorney labored under an actual conflict of interest which adversely affected his lawyer's performance." Perillo, at 447. Further, to show that counsel's representation was "adversely affected", a Petitioner need not show that the conflict changed the outcome of the trial. Perillo, at 448. "Once it has been established that an actual conflict exists, prejudice to the defendant is presumed." Mitchell v. Maggio, 679 F.2d 77, 79 (5th Cir.), *cert. denied*, 459 U.S. 912 (1982). In Beets v. Scott, 65 F.3d 1258, 1269 (5th Cir.), *cert. denied,* 517 U.S. 1157 (1996), the Fifth Circuit characterized this standard as a "not quite *per se* rule of prejudice."

The case of United States v. Fulton, 5 F.3d 605 (2nd Cir. 1993), is almost directly on

5

represented a defendant and two co-defendants who pleaded guilty and were expected to testify for the government at the defendant's trial.

In the instant case, not only did Counsel Pena represent co-defendants, [2] he also had a conflict more serious than that type of conflict set out in the foregoing cases: The conflict was between the Petitioner and the attorney himself. No conflict could divide the loyalty of counsel to an accused more than having to chose between one's client and oneself. Pena's loyalty to himself would naturally prevail over any loyalty to the Petitioner. A situation in which the attorney's own interests diverge from those of the client presents the same core problem presented in the multiple representation cases: the attorney's fealty to the client is compromised. Therefore, courts have held that an actual conflict exists and the presumption of prejudice set forth in Cuyler applies as well to situations where the personal interests of the attorney and the interests of the client are in actual conflict. *See, e.g.,* United States v. McLain, 823 F.2d 1457, 1463-64 (11th Cir. 1987) (actual conflict when counsel was under investigation for bribery); United States v. Ellison, 798 F.2d 1102, 1106-08 (7th Cir. 1986), *cert. denied*, 479 U.S. 1038 (1987) (actual conflict between lawyer and client when pursuit of client's interests would lead to evidence of attorney's malpractice); Government of Virgin Islands v. Zepp, 748 F.2d 125, 139 (3rd Cir. 1984) (actual conflict where defense attorney faced potential criminal liability for same charges for which defendant was being tried).

Petitioner submits that the affidavit of Albert Pena explaining his conflict, the trial court's minutes in which the conflict was discussed, and the customs agent's report, which are all

---

[2]According to the Minute entries in this case, Peña initially represented not only Petitioner, but also Manuel Guerra, Benny Silva and Juan Hernandez.

4

objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." In <u>Glasser</u>, the record showed that defense counsel failed to cross-examine a prosecution witness whose testimony linked Glasser with the crime, and also failed to object to the presentation of arguably inadmissible evidence. *Id.*, at 72-75. The Court found that both omissions resulted from counsel's desire to diminish the jury's perception of a co-defendant's guilt. Indeed, the evidence of counsel's "struggle to serve two masters [could not] seriously be doubted." *Id.,* at 75. Because this actual conflict of interest impaired Glasser's defense, the Court reversed his conviction. In <u>Cuyler</u>, the Court stated, "Glasser established that unconstitutional multiple representation is never harmless error." Once the court concluded in <u>Glasser</u> that defense counsel had an actual conflict of interest, it refused "to indulge in nice calculations as to the amount of prejudice" attributable to the conflict. The conflict itself demonstrated a denial of the "right to have the effective assistance of counsel." <u>Glasser</u>, at 76. A defendant who demonstrates that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. <u>Cuyler</u>, at 350. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance. <u>Glasser</u>, at 72-75.

Thus, an actual conflict of interest exists when an attorney represents two clients whose interest in the outcome of the matter are different. It was found that an actual conflict of interest existed in <u>Perillo v. Johnson</u>, 79 F.3d 441, 447-51 (5th Cir. 1996), when a single attorney represented both the defendant and a government witness who would have benefitted from testifying against the defendant. A similar ruling was made in <u>United States v. Alvarez</u>, 580 F.2d 1251 (5th Cir. 1978), where the Court found an actual conflict of interest when the same attorney

3

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE

The single issue before the Court for resolution is whether Jesus Escobar was deprived of his Sixth Amendment right to the effective assistance of counsel. Escobar claims that trial counsel was constitutionally deficient by reason of an incurable conflict of interest that hampered him in his pretrial investigation of the case; in his presentation of a trial defense; in his sentencing preparation; and in his appeal. Petitioner's ineffective assistance of counsel claim, because it is premised on an actual conflict of interest, is governed by the **"Cuyler Standard"** set out in Cuyler v. Sullivan, 446 U.S. 335 (1980). *See also,* Perillo v. Johnson, 79 F3d 441, 447 (5th Cir. 1996). As shown in the exhibits attached as an Appendix to this Writ, Jesus Escobar's counsel was, allegedly, using cocaine and laundering money supplied by the same drug smuggling organization which Petitioner was tried and sentenced as being the leader of. Counsel was, himself, a target of the government investigation involving the same criminal enterprise for and of which the Petitioner was being tried and accused. [1] Petitioner submits that the record of this case, along with the Exhibits attached hereto, establish as a matter of law that attorney Albert Peña was laboring under a flagrant **actual conflict** of interest. Therefore, Petitioner's claim is governed by the **Cuyler Standard.** Judged by the **Cuyler Standard,** the Petitioner was denied his Sixth Amendment right to the effective assistance of counsel.

In Glasser v. United States, 315 U.S. 60, 92 (1942), the United States Supreme Court stated that "In order to establish a violation of the Sixth Amendment, a defendant who raised no

---

[1] At least four co-defendants in Petitioner's case had debriefed and provided information to the government concerning attorney Albert Peña's involvement in criminal activity. Both the government and the Court were aware prior to trial that Pena's representation was compromised. Some of these same co-conspirators testified against Petitioner at trial.

2

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF TEXAS

# AT CORPUS CHRISTI

## NO. C-96-CR-84

**JESUS JOSE ESCOBAR,**
Petitioner,

VS.

**UNITED STATES OF AMERICA,**
Respondent.

FILED UNDER SEAL

TO THE HONORABLE HAYDEN W. HEAD, JR.
UNITED STATES DISTRICT JUDGE

## MOTION TO VACATE SENTENCE
## PURSUANT TO 28 U.S.C. § 2255

SCOTT M. ELLISON, P.L.L.C.
SBN: 00787432
1116 Santa Fe Street
Corpus Christi, TX 78404
Telephone: (361) 887-7600
Telecopier: (361) 882-4728